UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JENNIFER EASTER, individually and on behalf of B.E., a minor,[1]

                                            **Plaintiffs,**

v.                                                                   5:14-CV-1403 (BKS/TWD)

CAYUGA MEDICAL CENTER AT ITHACA,

                                            **Defendant.**
_____

**APPEARANCES:**

For Plaintiffs:
**Carla N. McKain, Esq.**
McKain Law, PLLC
136 E. State St.
Ithaca, NY 14850
**Oliver N. Blaise, III, Esq.**
Coughlin & Gerhart, LLP
99 Corporate Drive
Binghamton, NY 13904

For Defendant Cayuga Medical Center at Ithaca:
**Philip G. Spellane, Esq.**
**Emily D. Crowley, Esq.**
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

**Hon. Brenda K. Sannes, United States District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

       Plaintiff Jennifer Easter filed this action on November 19, 2014. (Dkt. No. 1). As amended, the Complaint alleged violations of Plaintiff's rights under the Employee Retirement

---

[1] B.E. was a minor when this case was filed. Plaintiff is directed to file a letter motion seeking to update the caption so that any further filings in this matter will reflect the correct caption.

1

Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") by her employer Cayuga Medical Center at Ithaca ("CMC"), its employee health plan ("Plan"), and the third-party claims administrator Excellus Health Plan, Inc. ("Excellus"). (Dkt. No. 27, p. 1). Among other claims, Easter alleged that CMC—the Plan Administrator—and the Plan failed to provide requested plan documents in violation of ERISA § 502(a)(1)(A). (*Id.* at ¶¶ 74–76). At summary judgment, the Court dismissed the § 502(a)(1)(A) claim as against the Plan and ruled, *inter alia*, that CMC violated that section. *Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, __ F. Supp. 3d __, 2016 WL 6820464, at *26–27, 2016 U.S. Dist. LEXIS 162999, at *80–82 (N.D.N.Y. Nov. 15, 2016). The Court also found that material questions of fact remained, which informed the imposition of monetary penalties for the violation. *Id.* Consequently, on May 1, 2017, the Court held a bench trial solely on the issue of monetary relief.[2] For the reasons stated below, the Court imposes a penalty under ERISA § 502(a)(1)(A) of $47,460 against Defendant CMC, payable to Easter.

## II.  FINDINGS OF FACT

In accordance with Fed. R. Civ. P. 52(a), after considering all of the testimony, the credibility of the witnesses, and all of the evidence, the Court makes the following findings of fact.[3]

Easter was a participant in the CMC Plan. Her son, B.E., suffers from significant psychological conditions. On February 5, 2013, he was admitted to Maple Lake Academy ("Maple Lake"), a licensed residential treatment facility ("RTF") in Utah.[4] Beginning in

---

[2] At summary judgment, the Court remanded adjudication of Plaintiffs' claims for insurance benefits. *Easter*, __ F. Supp. 3d __, 2016 WL 6820464, at *27, 2016 U.S. Dist. LEXIS 162999, at *82–83. The Court understands that this remand process is ongoing. The summary judgment ruling is incorporated in this decision, and familiarity with that decision is assumed.
[3] As set forth in the parties' joint pre-trial stipulation, many of the facts are undisputed. (Dkt. No. 76).
[4] As further described in the Court's summary judgment ruling, Maple Lake provided treatment that included daily clinical assessments, at least 20 hours of therapy per week, medication management, 24-hour supervision, a full-time

2

February 2013, and continuing into April 2015, Easter sought information from CMC about the Plan's coverage for RTFs like Maple Lake. The Court credits Easter's testimony and record evidence that she initially sought information about Plan coverage in order to determine whether to add her son to her policy or keep him on a separate policy. The Court credits the testimony of William Toth—the Benefits Manager at CMC—regarding documents that CMC sent Easter in response to her requests. (Pl. Exs. 2, 5–6). The Court finds that despite repeated requests for this information, Easter did not receive the governing document that she sought—hereinafter called the PPO Contract—until Excellus produced it in discovery for this litigation. Unlike the summary documents that CMC sent her, which do not contain any information regarding RTFs, the PPO Contract contained the coverage information that Plaintiff sought.

Easter first asked Toth what coverage would be available for her son's RTF when she met with Toth in his office on February 12, 2013. Easter provided Toth her son's diagnostic information that day. (Pl. Ex. 1). On February 19, 2013, Toth forwarded the diagnostic information to Beth Miller, an account manager at Excellus, and asked Miller whether "the boy[']s treatment in a residential treatment facility [would] be covered in our Plan." (Def. Ex. 37). Toth also asked Miller for a rough estimate of the "out-of-pocket costs" for the RTF. (*Id.*). Toth noted that "the mother and ex-spouse are incurring significant out-of-pocket costs for the boy's care." (*Id.*). Miller determined that the facility did not appear to be a participating provider, but did not respond to Toth's coverage questions. (*Id.*).

Easter and her counsel made repeated requests for coverage information. On March 1, 2013, Easter sent Toth an email asking him if he has been able "to investigate what, if any, coverage" her son "would get if he was on my insurance." (Pl. Ex. 1). On March 4, 2013, Toth

---

nurse, a part-time child-adolescent psychiatrist, and discharge planning. B.E. remained at Maple Lake through most of 2014.

sent Easter an email informing her that her son's RTF is not a participating provider.  (Def. Ex. 54).  Toth provided the deductible and co-insurance costs for non-participating providers, and said that he was "trying to get additional information from Excellus regarding what that would mean with respect to what you would have to pay."[5]  (*Id.*).  On March 15, 2013, Easter emailed Toth:

> Hey Bill,
> [W]e are hiring a lawyer to help us fight/negotiate with insurance regarding [redacted] therapeutic school coverage.  Our lawyer needs a copy of CMC's insurance policy so that we can make an informed decision about what insurance to place him under.  Other thoughts include having [redacted] on CMC's as well as my ex[-]partner[']s plan (Empire).  Additionally, I need to know the cost of having [redacted] on my insurance.
> Jen
> I will send you an email address for the lawyer soon.

(Pl. Ex. 1).  Two days later, Easter emailed Toth, asking him to email the insurance policy to her lawyer.  (*Id.*).

On March 21, 2013, Toth's assistant sent Easter's counsel the "Excellus Blue PPO health insurance spreadsheet."  (Pl. Ex. 2).  Plaintiff's counsel responded on April 8, 2013, that she needed "a complete copy" of the "'Plan Document' (not the SPD or summary of benefits, which you sent earlier)."  (Pl. Ex. 2).  Toth sent an email the next day to the Excellus account manager, informing her that Plaintiff has "hired an attorney to help her figure out where/how to get the best coverage for her son" and that the attorney insists that ERISA requires CMC to have a plan document "that provides detailed information on what is covered [and] how benefits are coordinated when a dependent is covered in two plans."  (Def. Ex. 41).  Toth said that he did not

---

[5] To the extent that Toth's testimony at trial reflects his opinion that RTF services were not covered under the Plan, the Court does not credit that testimony and does not interpret it to mean that he believed *at the relevant time* that coverage was unavailable.  Toth testified that when he asked Miller for information about coverage and looked at the summary documents, he was unable to determine coverage for Easter's son.  In addition, during examination by the Court, he later (1) testified that he was not familiar enough with diagnostic codes and other information to independently make a coverage determination and (2) appeared to confuse a summary document with another document.

4

believe there was a plan document, but noted that Plaintiff's attorney "would accept a Certificate of Coverage that gave her the same kind of detailed info on what is covered, coordination of benefits, etc." (*Id.*)  Toth said that he was going to produce the Summary of Benefits and Coverage, but asked "is a Certificate of Coverage with the detailed info she is looking for?[6]  If we are out of compliance we need to address this ASAP." (*Id.*).

On April 11, 2013, Toth sent Plaintiff's counsel the "Summary of Benefits and Coverage" (SBC); Toth stated that he would forward a copy of the plan document as soon as he received it from Excellus.  (*Id.*).

On May 10, 2013, Plaintiff sent Toth an email stating that she had called and left messages "trying to set up an appointment with you regarding insurance and my son," and had not heard back from him.  (Pl. Ex. 1).  She said that the residential treatment is $10,500 a month, and "I will soon be out of money to pay for my son in residential treatment." (*Id.*).  On May 14, 2013, Plaintiff's counsel sent an email to Toth, noting that the SBC he sent was not what she needed.  (Pl. Ex. 2).  Counsel stated that she had informed Toth on April 8th that she was specifically "requesting a copy of the plan document to evaluate [] plan coverage for [Easter's] son" and that she had orally informed Toth that she needed the document "to evaluate eligibility and coordination of benefits provisions, thus the SBC would not suffice." (*Id.*).  She continued, "While the summary plan description could possibly meet our needs if it is detailed and in compliance with ERISA, my experience with insured plans is that they typically do not have such SPDs, thus *you will likely need to send me the certificate of insurance or whatever serves as*

---

[6] The beginning of the PPO Contract states "[t]his Certificate of Coverage ('Certificate') explains the benefits available to you . . . ."

*your full plan document*." (*Id.*) (emphasis added). The Court finds that this request put CMC on notice that Easter sought the full terms of coverage—that is, the PPO Contract.[7]

On May 17, 2013, Plaintiff's counsel sent a fax to Toth's boss, Alan Pederson, Vice President of Human Resources at CMC, again seeking the plan document. Plaintiff's counsel stated, "I did receive a copy of the Summary of Benefits and Coverage, however, what I need is the Plan Document." (Pl. Ex. 4).

On May 20, 2013, Toth's assistant provided Plaintiff's counsel with a document titled "Plan Document," the Summary Plan Description (SPD) and the Summary of Benefits and Coverage (SBC). (Def. Ex. 45). This "Plan Document," however, does not contain any specific information about coverage, and the summaries do not contain any reference to RTFs. Toth himself was unable to determine from these summaries whether the RTF for Easter's son would be covered. Plaintiff therefore had to make a decision regarding whether to move her son into CMC's health plan without the coverage information she sought. Plaintiff did switch her son into the CMC plan; her son became a member in January 2014.

On March 26, 2014, Plaintiff left a "list of insurance documents" she was seeking with Toth's assistant. In an email to Toth on April 7, 2014, Plaintiff said that she had not yet received the documents; she asked Toth to send them "ASAP." (Pl. Ex. 1). Though the email does not specifically refer to the documents Plaintiff requested, Plaintiff testified at trial that to the best of

---

[7] In its opposition to Plaintiff's motion for summary judgment, CMC argued that Plaintiff never requested "the PPO Contract" and that CMC provided all of the documents Plaintiff requested. (Dkt. No. 41-23, p. 17). The Court rejected this argument in its ruling, noting that "[b]ecause the May 14, 2013 email can only be considered a request for the PPO Contract, and there is no dispute that CMC then failed to provide it, Plaintiffs are entitled to summary judgment on their claim under § 502(a)(1)(A). *Easter*, __ F. Supp. 3d __, 2016 WL 6820464, at *27, 2016 U.S. Dist. LEXIS 162999, at *80–81. The Court further noted that "it is undisputed that the PPO Contract contains more detailed benefits information than the documents that CMC provided." *Id.* at *26. In a puzzling disregard for the Court's ruling and the evidence, Defendant CMC again argued, at trial and in its pre-trial memorandum, that Plaintiff did not request the PPO Contract and that the documents CMC provided contained "the same" benefits information. CMC's continued assertion that Plaintiff failed to request the PPO Contract is particularly troubling in light of William Toth's trial testimony that it would be unreasonable to expect a participant like Easter to specifically ask for "the PPO Contract" because she would have had no way of knowing the name of that document.

6

her recollection, the list of documents included a request for the Plan's governing coverage document. The Court credits that testimony. In response to Plaintiff's request, Toth's assistant sent Plaintiff the SBC, and noted that she did not include the plan document or the SPD because there were no significant changes. (Def. Ex. 50).

Plaintiff did not receive the PPO Contract until after she filed a lawsuit alleging violations of ERISA in connection with claims for her son's treatment in the RTF. CMC did not produce the PPO Contract in response to Plaintiff's discovery request for "[a]ny and all documents describing the 'actual contract provisions' referenced in the 'Note' on Defendants' '2013 Medical Insurance' five-page summary chart." (Pl. Ex. 8; Dkt. No. 27-18, p. 35). Plaintiff obtained the PPO Contract from Excellus on April 21, 2015, in response to Plaintiff's discovery request for the Administrative Record in this case. (Dkt. No. 74, p. 11; Dkt. No. 75, p. 9).[8] Thus, the time between Easter's first request for the PPO Contract on May 14, 2013 and her receipt of the information is 708 days.

The PPO Contract contained detailed coverage information for mental health benefits, which was not available in the summary documents that CMC provided. *See* (Dkt. No. 41-6, pp. 7, 12, 14, 21, 48–50, 58). Based upon a review of all the relevant documents and the Toth testimony, the Court finds that the PPO Contract contained important information about coverage for Easter's son that was not contained in the documents that CMC provided. (Dkt. No. 41-6; Def. Exs. 2–6).

Finally, the Court finds that attorney time was expended trying to get the PPO Contract from CMC and credits Easter's testimony that she suffered anxiety and distress.

---

[8] Toth testified at trial that he was not aware of the PPO Contract until it was produced by Excellus in discovery. There is no dispute, however, that the PPO Contract contains the detailed coverage information Plaintiff sought. (Pl. Ex. 10, ¶ 6).

### III.   CONCLUSIONS OF LAW

ERISA §502(a)(1)(A) permits a participant or beneficiary of an ERISA health plan to bring a civil action for the relief available under subsection (c), which states in relevant part:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B). For violations occurring after July 29, 1997, "the maximum amount of the civil monetary penalty established by section 502(c)(1) of [ERISA]" was increased from $100 a day to $110 a day. *See* 29 C.F.R. § 2575.502c-1. The relevant Title establishes that Plan Administrators like CMC are required, "upon written request of any participant or beneficiary, [to] furnish a copy of the latest . . . trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).[9]

It "is left to the discretion of the district court" whether to impose penalties for violations of this requirement. *Lavigna v. State Farm Mut. Auto. Ins. Co.*, 73 F. Supp. 2d 504, 515 (N.D.N.Y. 2010) (internal quotation omitted). Five factors guide the Court's exercise of discretion: (1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary. *Id.* (citing *McDonald v. Pension*

---

[9] "ERISA's disclosure requirements were meant to arm plan participants with specific knowledge of their rights and remedies with respect to employee benefit plans." *Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-43 (2d Cir. 1997) (noting that contracts are covered under § 1024(b)(4) and finding that "other instruments" are "formal legal documents that govern or confine a plan's operations"); *see also Bilello v. JPMorgan Chase Ret. Plan,* 649 F. Supp. 2d 142, 168 (S.D.N.Y. 2009) (noting that "'[f]ormal documents' are those that set out the rights, duties, and obligations of employers and plan participants"). Whether considered a contract or an "other instrument," there is no dispute that the PPO Contract, containing the benefit coverage available to Easter, falls within § 1024(b)(4).

*Plan of NYSA-ILA Pension Trust Fund*, 320 F.3d 151, 163 (2d Cir. 2003)). "The presence or absence of any one of the factors, including prejudice, is not dispositive on the issue of sanctions." *Id.*

### A. Bad Faith or Intentional Conduct

Despite Plaintiff's repeated requests for a document containing the entire terms governing the Plan, the only documents with coverage information that CMC provided were summaries. At trial, CMC argued that it never possessed the PPO Contract, which contains the entire coverage terms, and that it therefore could not have provided the document to Easter.

While trial testimony and the evidentiary record reflect that CMC worked with Excellus each year to decide the extent of medical coverage for Plan participants, in this litigation, CMC could not produce any governing document that memorializes the details of that coverage. CMC has not explained how it initially contracted with Excellus and annually agreed to coverage provisions without retaining any details of that coverage.[10] Nor has CMC explained how it adjudicates final-level denial of benefits appeals based only upon documents that summarize coverage provisions, and not on those provisions themselves.

It defies reason that CMC could be unaware of the existence of a document like the PPO Contract.[11] The documents Toth sent containing coverage information were summaries of that coverage, as noted in prominently affixed notices on those documents and the documents' titles.

---

[10] The Court notes that there is some evidence in the summary judgment record regarding CMC's contract with Excellus which CMC did not address in the litigation regarding its liability under ERISA § 502(a)(1)(A). In the summary judgment proceeding Excellus filed a declaration by an Excellus claims project manager, Sherry Hunt, which addressed the benefits coverage provided by CMC. Ms. Hunt stated that while the document containing the benefits covered by CMC was not attached as an exhibit to the agreement between CMC and Excellus, "Excellus and CMC agreed that the PPO Option I benefit booklet" describes services that are covered by CMC. (Dkt. No. 42-1, p. 3). The "PPO Option I benefit booklet" appears to be the PPO Contract provided to Plaintiff by Excellus in discovery. (Dkt. No. 42-4; Pl. Ex. 9).

[11] The Court makes this finding with respect to CMC as an institution, and this Opinion does not imply that Toth's testimony was in any way dishonest.

(*Id.*).[12] Additionally, Easter's attorney repeatedly asked for a document containing the full terms of the Plan's coverage rather than a summary of benefits. (Pl. Exs. 2, 4). Furthermore, on April 9, 2013, Toth emailed Beth Miller at Excellus, stating that Easter's attorney had described the sought-after document as one that "provides detailed information on what is covered, how benefits are coordinated when a dependent is covered in two plans, qualifying events that open an enrollment period, etc." or that "gave her the same kind of detailed info on what is covered, coordination of benefits, etc." (Def. Ex. 41). He asks if such a document is available and notes his concern about ERISA compliance, but there is nothing in the record showing that he followed up after receiving a reply email stating that Beth Miller would "let [him] know." (*Id.*; Def. Ex. 53). Considering all of the evidence, the Court finds that CMC—as an institution—knew that the PPO Contract or a document like it existed.

In any event, as set forth above, the record establishes that Toth was on notice that Plaintiff wanted the full terms of coverage and that he knew the summary documents did not contain the information she was seeking; however, in response, CMC repeatedly sent Plaintiff only summaries. (Pl. Exs. 5–6). Repeated failure to provide a copy of a document "despite numerous requests . . . to do so, is, in the absence of any proffer by [the Plan Administrator] of a justification for its action, indicative of intentional conduct and bad faith." *Cohen v. Metro. Life Ins. Co.*, 485 F. Supp. 2d 339, 356 (S.D.N.Y. 2007); *see also Pagovich v. Moskowitz*, 865 F. Supp. 130, 138 (S.D.N.Y. 1994) (finding that where the Plan Administrator "never attempted to offer plaintiff or this Court any reasonable explanation for his failure to timely respond to the request for information," there was "no reason to believe that [the] lack of response was less than

---

[12] At trial, Toth testified that the summary notices led him to believe that there might be a governing contract document, but also that he was not particularly focused on those notices when corresponding with Easter and her attorney. He also testified that he did not know of the existence of the PPO Contract, but he never testified that he was unware that some governing document existed.

10

deliberate or willful"). In this case, even accepting, *arguendo*, CMC's claim that it did not *have* the PPO Contract or a document containing the same information, this was not a reasonable explanation.

In *Kascewicz v. Citibank, N.A.*, 837 F. Supp. 1312, 1323 (S.D.N.Y. 1993), for example, the court rejected a similar argument. There, the court found "utterly unconvincing" the Plan Administrator's argument that "because no SPD had been prepared for the [Plan], [the Plan Administrator's] failure to provide plaintiff with a copy *could not* have been the result of intentional conduct constituting bad faith." *Id*. (first alteration in original). The *Kascewicz* court also stated that "[f]ailure to prepare plan documents unambiguously required by ERISA cannot by any stretch of the imagination be considered a defense to reasonable requests for the documents." *Id.*; *see also Pagovich*, 865 F. Supp. at 136 n.3 (noting that any excuse attributed to the administrator's need to obtain the requested documents from a co-defendant "fails" because "[a]n administrator's duties are non-delegable"). Similarly, in this case CMC's argument that it did not possess the PPO Contract or have its own version of that document is unavailing where the facts show that CMC, as an institution, must have known that a governing document containing the full terms of coverage for the Plan existed and that it was the document Plaintiff was seeking. Based on this evidence, the Court finds disingenuous CMC's claim that it believed it was providing the requested documents when it was in fact providing mere summaries. Therefore, the Court finds that CMC's conduct was intentional.

**B. Length of Delay**

As noted above, the relevant delay is the period from May 14, 2013 to April 21, 2015—a total of 708 days. Under the facts of this case, the Court finds that this delay is exceedingly long. As Plan Administrator, CMC should have been able to provide Easter with the requested

11

information.  That Easter received the relevant document *almost two years after the request*, from a third party, and only after bringing a lawsuit, is antithetical to ERISA.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989) (citing legislative history for the proposition that Congress' purpose in enacting ERISA disclosure provisions was to "ensur[e] that the individual participant knows exactly where he stands with respect to the plan").

### C. Number of Requests Made

As noted above, Plaintiff and her counsel made repeated requests for the documentation that would enable her to determine what coverage the plan offered for RTFs.  The Court finds that Plaintiff made four requests for the PPO Contract: counsel's May 14, 2013 email to Toth, counsel's May 17, 2013 fax to Toth's boss, Plaintiff's email of April 7, 2014, and the discovery request during litigation.  Under the facts of this case, the Court finds that this factor weighs in favor of the imposition of monetary penalty.

### D. Extent and Importance of the Documents Withheld

The PPO Contract is the Plan's governing document with respect to coverage—it, along with its appendices, contains the full terms of coverage for participants and all of the information that Excellus (and presumably CMC) would need to adjudicate claims.[13]  As the parties' submissions and Toth's trial testimony make clear, RTF coverage information is not contained in any of the documents that CMC sent to Easter and can only be found in the PPO Contract.  In short, Easter was a member of the Plan but was denied access to its terms, most critically, the complicated provisions governing coverage for her son's residential treatment.  *See* (Dkt. Nos. 41-6; 47-4); *Easter*, 2016 WL 6820464 at *4–5.  Under these facts, the significant importance of the withheld document is self-evident and weighs heavily in favor of a monetary penalty.

---

[13] The testimony of Marybeth Miller—the Excellus account manager responsible for the CMC Plan—clarified that Excellus would use the PPO Contract to adjudicate claims.

12

### E. Prejudice

Finally, the Court considers prejudice to Easter as a result of her delayed receipt of the PPO Contract. Other courts have found prejudice based upon a participant's need to retain counsel to determine where she stands with respect to an ambiguous plan, *see Kascewicz*, 837 F. Supp. at 1323; and a participant's frustration, anxiety, distress, or aggravation, *see, e.g.*, *Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 847 n.10 (11th Cir. 1990). Plaintiff obtained an attorney to, *inter alia*, "make an informed decision about what insurance" to obtain for her son (Def. Ex. 39), and the attorney's ability to do that was hindered by CMC's failure to provide the PPO Contract. The record clearly indicates that attorney time was spent reviewing CMC documents and communicating with CMC in a futile attempt to obtain the relevant information. In addition, the Court credits Easter's testimony at trial regarding the anxiety and distress she suffered because she did not know where she stood regarding healthcare coverage. The Court also notes that Easter paid out of pocket for her son's treatments without knowing the details of the Plan coverage, which created both financial and psychological harm. Thus, the Court finds that Easter suffered prejudice as a result of the delay in obtaining the PPO Contract.

### F. Penalty Award

"The penalty was designed more to punish irresponsible ERISA administrators and fiduciaries than to compensate the pensioner for an actual loss." *McConnell v. Costigan*, 2002 WL 1968336, at *3, 2002 U.S. Dist. LEXIS 15826, at *8 (S.D.N.Y. Aug. 23, 2002) (internal quotation omitted). Having weighed the relevant factors and considered penalties imposed by other courts under similar circumstances, the Court finds that a penalty of $70 per day is appropriate in light of CMC's conduct and ERISA's purpose of ensuring that plan participants

know exactly where they stand with respect to the plan. *See, e.g.*, *Cohen v. Metro. Life Ins. Co.*, 485 F. Supp. 2d 339 (S.D.N.Y. 2007) (awarding $110 per day for 160 days, where the court found that the plan administrator's conduct was "indicative of intentional conduct and bad faith" and that "Plaintiff's efforts to present her claim . . . were hampered"); *Proujansky v. Blau*, 2001 WL 963958 (S.D.N.Y. 2001) (awarding a penalty of $20 per day for a total of $45,440, where the court found prejudice but not bad faith); *Pagovich v. Moskowitz*, 865 F.Supp. 130 (S.D.N.Y. 1994) (awarding $75 per day for 187 days where the court found bad faith or intentional conduct and noted that plaintiff suffered harm); *Kascewicz v. Citibank, N.A.*, 837 F.Supp. 1312 (S.D.N.Y. 1993) (awarding $25 per day for 891 days, where the court found bad faith and "some harm").

ERISA grants Plan Administrators 30 days to comply with a request for Plan documents, and penalties are imposed beginning only after the 30 days has expired. 29 U.S.C. § 1132(c)(1)(B). As noted above, the Court has found a 708 delay between Plaintiff's first request for the PPO Contract and receipt of that document. Taking into account the 30 days provision, CMC must pay for 678 days, or $47,460.

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that a penalty of $47,460, payable to Plaintiff Jennifer Easter, is assessed against Cayuga Medical Center at Ithaca.

**IT IS SO ORDERED.**

May 17, 2017
Syracuse, New York

*/s/ Brenda K. Sannes*
Brenda K. Sannes
U.S. District Judge

14